# CASE NO. 24-1416

## IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE
# FOURTH CIRCUIT

---

**JENNIFER FINN and KATHERINE MULDOON,**

*Appellants-Plaintiffs,*

**vs.**

**THE HUMANE SOCIETY OF THE UNITED STATES**

*Appellee-Defendant.*

---

On Appeal from the United States District Court for the District of Maryland
Civil Action No. 1:23-cv-02107-GLR
(The Honorable George L. Russell, III, presiding)

---

## OPENING BRIEF OF APPELLANTS

---

Francis J. Collins, Esq.
KSC Law
201 N. Charles St., Tenth Floor
Baltimore Maryland 21201
Fed Bar # 04272
AIS # 8501010118
fjcollins@kscadvocates.com
410-244-1010
Attorney for Appellants

Samantha M. Safchinsky, Esq.
KSC Law
201 N. Charles St., Tenth Floor
Baltimore Maryland 21201
Federal Bar # 30982
AIS # 2311290107
safchinsky@kscadvocates.com
410-244-1010
Attorney for Appellants

# Appellants' Disclosure Statement

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1416     Caption: Finn et al. vs. The Humane Society of the United States

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jennifer Finn and Katherine Muldoon
(name of party/amicus)

who is _____ Appellants _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

12/01/2019 SCC        - 1 -

i

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Francis J. Collins          Date: 5/16/2024

Counsel for: Appellants

- 2 -

[Print to PDF for Filing]

ii

# TABLE OF CONTENTS

I.      JURISDICTIONAL STATEMENT ................................................................1

II.      STATEMENT OF THE ISSUES .................................................................1

III.      STATEMENT OF THE CASE ....................................................................2

IV.      SUMMARY OF ARGUMENT .................................................................4

V.      ARGUMENT.............................................................................................6

     A.      THE DISTRICT COURT ERRED IN HOLDING THAT FINN AND MULDOON FAILED TO ADEQUATELY ALLEGE RELIGIOUSLY BASED OPPOSITION TO THE VACCINE MANDATE. ............10

         1.      The definition of religion under Title VII is broad, personal, and tied to an employee's "scheme of things." ...................10

         2.      Conscience is an inherent aspect of religion. ....................24

         3.      Appellant's objection to the use of aborted fetal tissue cell lines in the development of the vaccines implicates religious opposition............................................................................29

         4.      An employer violates Title VII if it inquires into the religiosity of an accommodation request without an objective basis for doing so. ................................................................32

     B.      THE DISTRICT COURT ERRED BY DISMISSING THE ADA COUNTS BECAUSE APPELLEE MADE MEDICAL INQUIRIES THAT WERE NOT JOB RELATED AND CONSISTENT WITH BUSINESS NECESSITY AND THAT WERE MORE INTRUSIVE THAN NECESSARY. ......................................................................33

     C.      THE DISTRICT COURT ERRED WHEN IT HELD THAT APPELLANTS HAD NOT ALLEGED SUFFICIENT FACTS TO STATE A CLAIM THAT THEY WERE "REGARDED AS" DISABLED BY THEIR EMPLOYER. ............................................43

VI.      CONCLUSION.........................................................................................46

VII.      STATEMENT REGARDING ORAL ARGUMENT ...................................47

# TABLE OF AUTHORITIES

## Cases

Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d 444  (7th Cir. 2013) ................18

Africa v. Pennsylvania, 662 F.2d 1025 (3rd Cir. 1981) ..................................... 28, 29

Allen v. Baltimore Cnty., Md., 91 F. Supp. 3d 722 (D. Md. 2015) ........................34

Biden v. Missouri, 142 S. Ct. 647 (2022) ................................................................41

Blake v. Baltimore Cty., 662 F. Supp. 2d 417 (D. Md. 2009) ................................34

Camp v. L.A. Arena Co., LLC, 2023 WL 4680797 (C.D. Cal. 2023) ....................23

Coffey v. Norfolk S. Ry. Co., 23 F.4th 332 (4th Cir. 2022) .....................................6

Coker v. Enhanced Senior Living, Inc., 897 F. Supp. 2d 1366 (N.D. Ga. 2012) ....45

Conroy v. New York State Dept. of Corr. Servs., 333 F.3d 88 (2d Cir. 2003).. 34, 40

Coursey v. Univ. of Maryland E. Shore, 2013 WL 1833019 (D. Md. Apr. 30, 2013), aff'd, 577 Fed. Appx. 167 (4th Cir. 2014) .....................................................34

Davenport v. Michelin N. Am., Inc., 2012 WL 5381193 (D.S.C. 2012), report and recommendation adopted, 2012 WL 6212517 (D.S.C. Dec. 13, 2012) ........34

Davis v. Fort Bend Cty., 765 F.3d 480 (5th Cir. 2014) ............................................18

Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) ....................... 30, 31

Does 1-11 v. Bd. of Regents of the Univ. of Colo., 2024 WL 2012317 (2024) ......11

E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015)......8, 11, 12, 25

E.E.O.C. v. Consol Energy, Inc., 860 F.3d 131 (4th Cir. 2017)........................ 13, 17

E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307 (4th Cir. 2008) ............13

E.E.O.C. v. Ilona of Hungary, 108 F.3d 1569 (7th Cir. 1997) ................................13

E.E.O.C. v. Red Robin Gourmet Burgers, 2005 WL 2090677 (W.D. Wash. 2005) 15

E.E.O.C. v. STME, LLC, 938 F.3d 1305 (11th Cir. 2019) ......................................45

E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados, 279 F.3d 49 (1st Cir. 2002) ............................................................................18

E.E.O.C. v. United Healthcare Services, Inc., No. 2:23CV3010 (S.D. Ohio Sept. 19, 2023) ...................................................................................................... 24, 29

Eeuca v. Wash. State Univ., 2023 WL 3575503 (D. Mass 2023) appeal docketed, No. 23-35395 (9th Cir. 2023) ................................................................................15

Finn v. Humane Soc'y of United States, 2024 WL 1765702 (D. Md. 2024)............3

Flanary v. Baltimore Cnty., Md., Civil No. CCB-16-3422, 2017 WL 1953870 (D. Md. May 11, 2017) ......................................................................34

Forsyth v. Univ. of Alabama, Bd. of Trustees, No. 20-12513, 2021 WL 4075728 (11th Cir. Sept. 8, 2021).........................................................45

Foshee v. AstraZeneca Pharms. LP, 2023 WL 6845425 (D. Md. 2023)25, 26, 37, 45

Fowler v. Rhode Island, 345 U.S. 67 (1953) .....................................17

Fredenburg v. Contra Costa Cnty. Dep't of Health Servs., 172 F.3d 1176 (9th Cir.1999) ...............................................................................34

Friedman v. Clarkstown Cent. Sch. Dist., 75 F. App'x 815 (2d Cir. 2003).............14

Friend v. AstraZeneca Pharmaceuticals LP, 2023 WL 3390820 (D. Md. 2023) .......4

Gardner-Alfred v. Fed. Reserve Bank of New York, 651 F. Supp. 3d 695 (S.D.N.Y. 2023), ..............................................................................23

Garlitz v. Alpena Reg'l Med. Ctr., 834 F. Supp. 2d 668 (E.D. Mich. 2011) ...........43

Gen. Elec. Co. v. Gilbert, 429 U.S. 125 (1976) .....................................38

Groff v. DeJoy, 600 U.S. 447 (2023). ..............................................25

Hernandez v. Commissioner, 490 U.S. 680 (1989) .................................16

Holt v. Hobbs, 574 U.S. 352 (2015) ................................................20

Jorgenson v. Conduent Transp. Sols., Inc., 2023 WL 1472022 (D. Md. 2023) (affirmed per curium in an unreported decision, 2023 WL 410570)............41

Keene v. City of San Francisco, 2023 WL 3451687 (9th Cir. 2023)........... 6, 16, 18

Kennedy v. Bremerton School District, 597 U.S. 507 (2022) ................................27

Kent v. Johnson, 821 F.2d 1220 (6th Cir. 1987) .....................................14

Kiel v. Mayo Clinic Health Sys. Se Minn., 2023 WL 5000255 (D. Minn. 2023) ...29

Leigh v. Artis-Naples, Inc., No. 2:22-cv-606-JLB-NPM, 2022 WL 18027780 (M.D. Fla. Dec. 30, 2022) ..............................................................23

Lewis v. Gov't of District of Columbia, 282 F. Supp. 3d 169 (D.D.C. 2017).........34

Maryland Shall Issue, Inc. v. Moore, 86 F.4th 1038 (4th Cir. 2023), reh'g en banc granted, No. 21-2017 (L), 2024 WL 124290 (4th Cir., 2024)......................21

Nat'l Fed'n of Indep. Bus., 595 U.S. 109 (2022) ....................................41

Patrick v. LeFavre, 745 F.2d 153 (2nd Cir. 1984)...................................17

Porter v. U.S. Alumoweld Co., Inc.,125 F.3d 243 (4th Cir. 1997)...........................34

Psak v. Bernhardt, 2020 WL 2849985 (D.D.C. 2020).............................34

Purvenas-Hayes v. Saltz, Mongeluzzi & Bedensky, P.C., No. 2:23-CV-02403-JDW, 2023 WL 8702739 (E.D. Pa., 2023) ............................................................37

Redmond v. GAF Corp. 574 F.2d 897 (7th Cir. 1978) .............................................18

Ringhofer et al. vs. Mayo Clinic, Ambulance, 102 F.4th 894 (8th Cir. 2024). passim

Roe v. Wade, 410 U.S 113 (1973)............................................................................31

Rolovich v. Washington State Univ., 2023 WL 3733894 (E.D. Wash. May 30, 2023), judgment entered, 2023 WL 5120279 (E.D. Wash. 2023) ..................... 22, 23

Savel v. MetroHealth Sys., 2024 WL 1190973 (6th Cir. 2024) ...............................7

Shigley v. Tydings & Rosenberg LLP, 2024 WL 1156613 (D. Md. 2024)....... 28, 45

Smith v. Terminix Pest Control, Inc., 2023 WL 3569127 (E.D. La. May 19, 2023) ................................................................................................................31

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ..................................................7

Tagore v. United States, 735 F. 3d 324 (5th Cir. 2013)............................................16

Thomas v. Corwin, 483 F.3d 516 (8th Cir. 2007) ....................................................34

Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707 (1981).............. 14, 17

United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481 (3d Cir. 2017) .......36

United States v. Ballard, 322 U.S. 78, 86 (1944)....................................................14

United States v. Manneh, 645 F. Supp. 2d 98 (E.D.N.Y. 2008).............................14

United States v. Meyers, 906 F. Supp. 1494 (D. Wyo. 1995), aff'd, 95 F.3d 1475 (10th Cir. 1996).............................................................................................18

United States v. Seeger, 380 U.S. 163 (1965)................................................. passim

Welsh v. U.S., 398 U.S. 333 (1970) ................................................................ passim

**Statutes**

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 .......................................................................................................1

42 U.S.C. § 12101 ...................................................................................................1, 4

42 U.S.C. § 12101(3)(A)...........................................................................................45

42 U.S.C. § 12102(3) ................................................................................................44

42 U.S.C. § 12112(d)(3)(B-C) ..................................................................................42

42 U.S.C. § 12112(d)(4)(B) .....................................................................................35

42 U.S.C. § 2000e(j) .......................................................................................1, 11, 24

42 U.S.C. § 2000e-2 ................................................................................1, 11

**Other Authorities**

118 Cong. Rec.-Senate 705 (1972). ..........................................................19

**Regulations**

29 C.F.R. § 1630.14 ........................................................................... 35, 43

E.E.O.C. What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, at K.9, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K ...............................................39

E.E.O.C., Compliance Manual, § 12-I-A-3 (Jan. 15, 2021) ........................ 8, 20, 32

## I.   JURISDICTIONAL STATEMENT

The United States District Court for the District of Maryland, George L. Russell, III, granted a motion to dismiss the complaint and rendered judgment against both of the Appellants, Jennifer Finn and Katherine Muldoon (Finn and Muldoon), on April 24, 2024.  JA24.  The judgment adjudicated all claims as to all parties.  The District Court's jurisdiction was established under 28 U.S.C. § 1331 as a civil proceeding arising under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and the Americans with Disabilities Act, (ADA), 42 U.S.C. § 12101 *et seq*.

Under 28 U.S.C. § 1291 the Court of Appeals has jurisdiction over all final decisions of the federal district courts.  The Appellants filed a timely Notice of Appeal on May 3, 2024.

## II.   STATEMENT OF THE ISSUES

**A.   Did the District Court err when it parsed Appellants' religious exemption request forms which articulated religious opposition to the COVID-19 vaccines and recharacterized them as nonreligious as a matter of law?**

**Short Answer:  Yes.  The District Court Judge is not in a position, when ruling on a motion to dismiss, to determine what is religious in the Appellants' "scheme of things."**

**B.   Did the District Court err when it held that an employer may make medical inquiries of employees who are not disabled that are not job-related and consistent with business necessity or inquiries that are broader and more intrusive than necessary?**

1

**Short Answer: Yes. The ADA's medical inquiry provisions protect all employees, not merely disabled employees. Therefore, employers are prohibited from making medical inquiries that are not job-related and consistent with business necessity or which are broader and more intrusive than necessary.**

**C.    Did the District Court err when it held that Appellants' status as unvaccinated against COVID-19 was not an impairment that could cause Appellants to be regarded as disabled by Appellee?**

**Short Answer. Yes. At the time of Appellee's vaccine mandate, unvaccinated individuals were limited in many of life's major activities and Appellants alleged sufficient facts from which a trier of fact could find that they were regarded as disabled.**

## III.    STATEMENT OF THE CASE

Finn and Muldoon were employed by the Humane Society of the United States (HSUS) and were performing their duties remotely, from their homes. JA04, JA05, JA43. Their jobs were administrative in nature, and their ability to perform the essential functions of their positions was not impaired by their status as unvaccinated. JA21, JA37, JA41. In late 2021 HSUS announced a company-wide COVID-19 vaccine mandate. Finn and Muldoon submitted requests to be exempted from the mandate based on religious opposition to the vaccines. The requests for exemption were denied. JA10, JA13. Finn and Muldoon were fired for not being vaccinated. They filed claims with the E.E.O.C. and later obtained right-to-sue letters. They timely filed a joint complaint in the District Court alleging violations

2

of Title VII and the Americans with Disabilities Act (ADA). JA08.

On April 24, 2024, the Honorable George L. Russell, III dismissed the entire complaint, including the count for religious discrimination. JA42. Judge Russell relied on one issue as to the religious discrimination count. He held that neither Finn nor Muldoon "adequately plead that their objections to the COVID-19 vaccine were based on religious beliefs." JA51. *Finn v. Humane Soc'y of United States,* 2024 WL 1765702, at *4 (D. Md. 2024). Judge Russell accepted that Finn and Muldoon adequately alleged that their beliefs were sincerely held. JA50. He also held that Finn and Muldoon informed the employer of their beliefs and were disciplined for their failure to comply with the conflicting employment requirement [vaccination]. JA50. Thus, the sole issue to be decided in this Court, relevant to religious discrimination, is whether the complaint and its attachments adequately alleged that their objection to the vaccine was "religious in nature." JA51, JA53.

Judge Russell held that Finn's recitation in her exemption request to her "conscience," and "faith in God the Father and his son Jesus Christ," *inter alia,* do not amount to a religious objection. JA09. Similarly, regarding Muldoon, her objection to the vaccine because of its links to aborted fetal tissue cell lines was not sufficiently linked to a "religious belief." *Id.* Judge Russell missed the mark. He expected Finn and Muldoon to convince him that their religious beliefs logically lead to their opposition to the vaccines. The Supreme Court does not permit this judicial inquiry into religion.

3

The District Court also dismissed the ADA counts. He wrongly held that inquiries into an employee's vaccination status was not a medical inquiry. He also incorrectly held that Appellants were not "regarded as" disabled.

## IV.    SUMMARY OF ARGUMENT

Finn and Muldoon sued HSUS for religious discrimination in violation of Title VII (Count 1). JA04. They also sued for violation of the Americans with Disabilities Act (ADA) (Counts 2 and 3). In Count 2 they alleged that HSUS made medical inquiries that were not job related or consistent with business necessity and which were not narrowly tailored to a business purpose. JA19. In Count 3 they alleged that they were protected under the ADA because they were "regarded as" disabled due to their unvaccinated status. JA24.

The District Court dismissed the religious discrimination count on the ground that, by claiming the right to exercise their religiously formed personal conscience, Finn and Muldoon were seeking a "'blanket privilege' with no principled limitation in scope." JA52. The District Judge relied on his colleague in the same courthouse who wrote: "[I]f deemed a bona fide religious belief it [personal conscience] "would amount to a blanket privilege and a limitless excuse for avoiding all unwanted obligations" (cleaned up). *Friend v. AstraZeneca Pharm. LP,* 2023 WL 3390820, at *3 (D. Md. 2023).

In *U.S. v. Seeger,* 380 U.S. 163 (1965) and *Welsh v. U.S.,* 398 U.S. 333 (1970) the Supreme Court of United States addressed religious discrimination in the context

4

of conscientious objectors and the military draft. The Court held that religion is so broad that it includes objections that even the conscientious objector categorized as non-religious. Religion is defined by reference to the person's "own scheme of things." *Seeger*, 380 U.S. at 184–85. The District Court's concern about a blanket privilege or chaos in the workplace, where all employees may make their own rules, is fallacious and hyperbolic. When an employee articulates a sincerely held religious objection to a workplace rule, the question is not the validity of the religion or the belief, or its religiosity, but whether the employer can accommodate the employee. If the only accommodation that can be provided is unreasonable, the employer need not provide it. Chaos in the workplace does not ensue. However, when faced with a sincere request for religious accommodation, the employer's failure to provide reasonable accommodation is the *sine qua non* of religious discrimination.

A few weeks ago, on May 24, 2024, the Eighth Circuit Court of Appeals issued its opinion in *Ringhofer et al. vs. Mayo Clinic, Ambulance*, 102 F.4th 894 (8th Cir. 2024). That decision reversed the District Court and held that the plaintiffs had stated a claim for religious discrimination. The complaint in the instant case is similar in all material respects to the Title VII complaint filed in the District Court in that case. For instance, in Ringhofer the plaintiffs alleged that the vaccines conflicted with their views that there body was a "temple of the Holy Spirit," that the vaccines were derived from aborted fetal tissue cell lines, and being vaccinate was against their "conscience." The Ninth Circuit Court of Appeals is in accord with

*Ringhofer.* *See* *Keene v. City of San Francisco,* 2023 WL 3451687, at *6 (9th Cir. 2023). In short, the two Circuit Courts addressing the issue presented in this case head-on, *Ringhofer* and *Keene,* are strong support for Finn and Muldoon.

The District Court also erred by dismissing the ADA counts. First, the ADA prohibits an employer from making medical inquiries that are not job-related and consistent with business necessity and inquiries that are no broader or more intrusive than necessary. COVID-19 is not a job-related condition—it was simply part of life in 2022 and the jobs held by Finn and Muldoon were performed remotely. They posed no threat to co-workers, much less a "direct threat." *Coffey v. Norfolk S. Ry. Co.,* 23 F.4th 332, 339 (4th Cir. 2022). Thus, the inquiries into the vaccination status of Finn and Muldoon were, in and of themselves, a violation of the ADA. Second, HSUS regarded Appellants as disabled due to their unvaccinated status. Under the ADA, an employer such as HSUS, is prohibited from terminating employees based on a perceived disability without engaging in the reasonable accommodation process.

## V. ARGUMENT

### SUMMARY OF THE FACTS

Finn was an employee with HSUS for ten years. JA05. She had been working remotely from her home since 2016. JA05, JA08. Muldoon was offered her position on December 21, 2021, and began work on January 18, 2022. She

worked remotely from her home for the entire time she was employed by HSUS. JA05.

On November 22, 2021, Finn filed a request for religious exemption from the vaccine. JA06. HSUS denied the request without explanation ten days later. JA06. When Finn inquired regarding an appeal process, HSUS responded that all decisions were final. Finn was fired on January 3, 2022. On January 25, 2022, Muldoon filed a request for religious exemption from the vaccine. HSUS denied the request without explanation. Muldoon was fired on February 7, 2022. Neither Finn nor Muldoon received a reason for the denial of their requests. JA06.

In Finn's request for religious accommodation, Finn cited Catholic teachings aligning with her faith that would be betrayed by getting vaccinated against COVID-19. She wrote, in part: "[m]y conscience and heart are guided by my faith in God the Father and his son Jesus Christ. The HSUS policy would unjustly force me to act in betrayal to my conscience and faith." JA09. She elaborated further on this request during her two follow-up interviews. Her typed statement refers to the Roman Catholic Pope's encyclical, her conscience, a statement by Catholic Bishops in Wisconsin, and the law of God written on her heart. JA37, JA38.[1] Finn's main

---

[1] By including the exemption request forms in the body of the complaint and as attachments, Finn and Muldoon do not mean to imply that the Court is limited to reviewing only the documents submitted to the employer. The complaint need only state a claim and need not include all proof of the claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Savel v. MetroHealth Sys.*, 2024 WL 1190973 at *7 (6th Cir. 2024). Moreover, the Supreme Court held that the employer did not even

focus is summarized by "My heart, conscience and faith in God and Jesus prevent me from complying with the mandate." *Id.*

Finn submitted her request on a form provided by HSUS. JA12; JA38. This form required Finn to attest that the information in her exemption request was "true and accurate to the best of [her] knowledge." In addition, after filing, Finn was contacted via email asking whether she would engage in disease mitigation measures such as masking and testing as requested by HSUS. She replied that she would do so. JA10.

When Finn filed for a religious exemption, HSUS did not start from the position that the employee's religious views were sincerely held unless there was objective evidence to prove otherwise, as required under Title VII.[2] HSUS did not accept that Finn could have a sincere conscientious and religious objection to the vaccine. Instead, it interviewed Finn twice regarding her sincerely held religious beliefs, interrogating her about earlier vaccinations and probing for more information regarding her already articulated religious beliefs and how they conflict with the vaccine. JA10.

Despite her answers, Finn received an email from HSUS informing her that her "request ha[d] been denied." The notice provided no explanation but ordered that

_____

need to know that an employee's objection was based on religious principles. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 774 (2015). The District Court should not have resolved the case under Fed. R. Civ. Proc. 12(b)(6).

[2] E.E.O.C, Compliance Manual, § 12-I-A-3 (Jan. 15, 2021).

8

she comply with the vaccine mandate, or her last day of employment would be January 3, 2022. HSUS did not elaborate further and did not let Finn appeal the decision.

The fact that Finn worked remotely since 2016, combined with her willingness to mask and social distance at work events, shows HSUS could have accommodated her with ease. JA11. When Finn had to attend events as part of her work duties, all events were held at off-site locations, and all such events lacked any vaccine policies and let unvaccinated people attend. JA11.

In Muldoon's request for religious accommodation, Muldoon cited the use of aborted fetal tissue cell lines in the creation and the testing of the vaccine as going against her spiritual and religious beliefs. She wrote, in part: "[a]ccepting this vaccine would compromise the religious beliefs founded in my Christian upbringing that fetuses are individuals and did not consent to the use of their bodies in medical testing or production. As such, taking this vaccine would make me complicit in an act that offends my spiritual and religious faith." JA12. Muldoon's accommodation request referred to her moral and ethical beliefs, "right and wrong," the sanctity of human life, including that of a fetus, her Christian upbringing, and her spirituality. JA10; JA40. After filing her request for accommodation, Muldoon was contacted via email inquiring whether she would engage in disease mitigation measures such as masking and testing as requested by HSUS. She replied that she would do so. JA37.

When Muldoon filed for a religious exemption, HSUS did not start from the position that the employee's religious views were sincerely held unless there was objective evidence to prove otherwise, as required under Title VII. After filing for an exemption, Muldoon participated in an interview with HSUS regarding the sincerity of her religious beliefs. She was interrogated about earlier vaccinations, her religious denomination, and what part of her beliefs conflict with receiving the COVID-19 vaccine. Despite her answers, on February 1, 2022, Muldoon received an email that provided no explanation, and merely said that Muldoon's "request ha[d] been denied," and she must comply with the vaccine mandate, or her last day of employment would be February 7, 2022. HSUS did not elaborate further and did not let Muldoon appeal the decision. JA13.

HSUS never asked Finn or Muldoon to address concerns about the religiosity of their opposition. The fact that their work was conducted from home, combined with their willingness to mask and social distance at work events if there were to be any, shows that HSUS could have accommodated them with ease. JA11, JA14.

### A.  THE DISTRICT COURT ERRED IN HOLDING THAT FINN AND MULDOON FAILED TO ADEQUATELY ALLEGE RELIGIOUSLY BASED OPPOSITION TO THE VACCINE MANDATE.

#### 1.  The definition of religion under Title VII is broad, personal, and tied to an employee's "scheme of things."

Title VII states that "[i]t shall be an unlawful employment practice for an

10

employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion." 42 U.S.C. § 2000e-2.  An employer must "reasonably accommodate to an employee's or prospective employee's religious observance or practice," absent "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).  "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices.  Rather, it gives them favored treatment..." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 775 (2015).  The Tenth Circuit Court of Appeals recently made the point that a COVID-19 policy that treats secular exemptions more favorably than religious exemptions is illegal because it "devalues religious reasons … by judging them to be of lesser import than nonreligious reasons." *Does 1-11 v. Bd. of Regents of the Univ. of Colo.*, 2024 WL 2012317, at *19 (2024).

Title VII's protection of religion is broad.  In *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 774, the Supreme Court explicitly held that Title VII does not require the plaintiff to show that the employer knew about the plaintiff's religious beliefs.  Title VII "does not impose a knowledge requirement." *Abercrombie,* 575 U.S. 768 at 773.  An employer can be found liable for religious discrimination even when it does not know that its practice has a discriminatory effect:

> Abercrombie's primary argument is that an applicant cannot show disparate treatment without first showing that an employer has "actual knowledge" of the applicant's need for an accommodation.  We

disagree. Instead, an applicant need only show that his need for an accommodation was a motivating factor in the employer's decision.

*Id.* at 772. The Supreme Court also explained:

Thus, the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward: An employer may not make an applicant's religious practice, <u>confirmed or otherwise,</u> a factor in employment decisions.

*Id.* at 773 (emphasis added). By stating "confirmed or otherwise" the Court was holding that the employer and the District Court do not have a role in confirming the nature of an employee's religious practice. The focus is on the employee's need for accommodation, not the tenets of the employee's religion. *Id.* "If the [employee] actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII." *Id.* at 773-74. In a footnote, the Supreme Court found that the employer's suspicion of a religious motive was sufficient to state a claim.[3] In the instant case, HSUS had more than sufficient reason to "suspect" that Finn and Muldoon were objecting to the vaccines on religious grounds. In short, suspicion of a religiously based opposition to the work rule, vaccination, is enough

---

[3] "While a knowledge requirement cannot be added to the motive requirement, it is arguable that the motive requirement itself is not met unless the employer at least suspects that the practice in question is a religious practice—i.e., that he cannot discriminate "because of" a "religious practice" unless he knows or suspects it to be a religious practice. That issue is not presented in this case, since Abercrombie knew—or at least suspected—that the scarf was worn for religious reasons." *Abercrombie,* 575 U.S. at 774, fn. 3.

12

to have pushed the employer to reach the duty to consider reasonable accommodations. Moreover, it is wholly irrelevant that the work rule is facially neutral or advisable as a matter of public health. *Id.* 575 U.S. at 775.

In *E.E.O.C. v. Ilona of Hungary*, 108 F.3d 1569 (7th Cir. 1997) the Seventh Circuit Court of Appeals affirmed a judgment for employees who alleged Title VII discrimination when they were fired for taking time off to observe a religious holiday. *Ilona*, 108 F.3d at 1577. The court emphasized that Title VII imposes "an affirmative duty on employers to reasonably accommodate the religious observances and practices of its employees…" *Id.* at 1574. This means that after an employee demonstrates a *prima facie* case of discrimination (which involves only an employee's statement of sincere religious belief that conflicts with an employer's policy), it is the employer's burden to either make reasonable accommodations or show that accommodations would result in an undue hardship. *Id.* at 1575, 1576.

To establish a prima facie case of an employer's violation of the duty to reasonably accommodate an employee's religious observance or practice, an employee must prove "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017); *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). Judge Russell specifically held that Finn and Muldoon had established the

13

second and third elements listed above but fell short with regard to the first, contending that they had failed to establish the religiosity of their beliefs. JA50.

The Supreme Court warned that courts have a limited function in determining whether religious beliefs are protected. *See, e.g., Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). *See also Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815, 818 (2nd Cir. 2003). A court's review of what constitutes a religious objection is "understood to be, without qualification, [based on] a highly 'subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system.'" *U.S. v. Manneh*, 645 F. Supp. 2d 98, 108 (E.D.N.Y. 2008). The Supreme Court explained in the context of a conscientious objector case:

> The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. But these are inquiries foreclosed to Government. As Mr. Justice Douglas stated in *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944): 'Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others.' Local boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.

*Seeger*, 380 U.S. at 184–85. The sincerity of the conscientious objector labeling his or her objection as religious, was considered "of course" a "question of fact." *Id.* See also, *Kent v. Johnson,* 821 F.2d 1220, 1224-25 (6th Cir. 1987) (The inquiry into

14

"whether the belief or practice is religious … [is] factual in nature); *E.E.O.C. v. Red Robin Gourmet Burgers,* 2005 WL 2090677, at *3 (W.D. Wash. 2005) (denying summary judgment against a plaintiff who argued that not covering his tattoos was religiously based and not a mere personal preference); *Eeuca v. Wash. State Univ.,* 2023 WL 3575503 at *6 (D. Mass 2023) *appeal docketed*, No. 23-35395 (9th Cir. 2023) (failure to articulate religious beliefs with clarity and precision does not require dismissal).

> *Seeger* and *Welsh* tie religion directly to issues of morality:

> What is necessary under *Seeger* for a [belief] to be religious…is that this [belief] stem from the registrant's moral, ethical or religious beliefs about what is right or wrong and that these beliefs be held with the strength of traditional religious convictions. Most of the great religions of today and of the past have embodied the idea of a Supreme Being or a Supreme Reality - a God - who communicates to man in some way a consciousness of what is right and should be done, of what is wrong and therefore should be shunned."

*Welsh,* 398 U.S. at 340.

The conscientious objector in *Welsh* "categorized his beliefs as having been formed by reading in the fields of history or sociology," and denied that his views were religious. *Id.,* 341. The *Welsh* court reasoned that "very few registrants are fully aware of the broad scope of the word 'religious' as used in [the Selective Service Act], and accordingly a registrant's statement that his beliefs are nonreligious is a highly unreliable guide…" *Id. at* 341. The Court focused on Welsh's statement that he "believe[d] the taking of life – anyone's life – to be morally

wrong." Welsh explained that "I believe that human life is valuable in and of itself … I cannot, therefore conscientiously comply with the government's insistence that I assume duties which I feel are immoral and totally repugnant." *Id.* at 43. The *Welsh* Court held that "[o]n the basis of these beliefs and the conclusion of the Court of Appeals that he held them 'with the strength of more traditional religious convictions' … Welsh was clearly entitled to a [religious] exemption." *Id*. at 343.

*Seeger* tells us that its test for determining whether a belief is religious "is simple of application. It is essentially an objective one, namely, does the claimed belief occupy the same place in the life of the [believer] as an orthodox belief in God holds in the life of [the orthodox believer]." *Id*., at 184. *Seeger* adds that "[i]n such an intensely personal area, of course, the claim of the [selective service] registrant that his belief is an essential part of a religious faith must be given great weight." *Id*. at 184. *See also Tagore v. U.S.*, 735 F. 3d 324, 328 (5th Cir. 2013) ("[C]laims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions."). In *Hernandez v. Commissioner,* 490 U.S. 680, 699 (1989) the Supreme Court explained: "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Religious beliefs need not be rational— only sincere—to be protected under Title VII. *Keene v. City and County of San Francisco*, 2023 WL 3451687, at *2 (whether the belief that vaccines contained fetal cells was unfounded does not negate the belief as sincerely held).

16

In *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) the Supreme Court stated that "it is no business of courts to say ... what is a religious practice or activity." The inquiry as to whether a person's belief is religious is twofold: "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." *Patrick v. LeFavre*, 745 F.2d 153, 157 (2nd Cir. 1984) (quoting *Seeger*, 380 U.S. at 185). The *Patrick* Court continued:

> Properly cognizant of the judiciary's incapacity to judge the religious nature of an adherent's beliefs, courts have jettisoned the objective, content-based approach previously employed to define religious belief, … in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system. *See Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 713–15 (1981); *United States v. Seeger, supra;* … By limiting the factfinder's inquiry to a determination whether "the beliefs professed ... are, in [the claimant's] own scheme of things, religious," *Seeger, supra,* 380 U.S. at 185, 85 S.Ct. at 863, it follows concomitantly that the claim of the adherent "that his belief is an essential part of a religious faith must be given great weight." *Seeger, supra,* 380 U.S. at 184, 85 S.Ct. at 863; see also P. Tillich, Dynamics of Faith 1–2 (1958). Impulses prompted by dictates of conscience as well as those engendered by divine commands are therefore safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature.

*Id.* 745 F.2d at 157–58. In *Ringhofer v. Mayo Clinic, Ambulance,* 102 F.4th at 902, the Eighth Circuit accepted the plaintiffs' assertions about religious opposition to vaccination that were remarkably similar to those made by Finn and Muldoon. *See also, E.E.O.C. v. Consol Energy, Inc.,* 860 F.3d at 142 (holding "it is not [the employer's], nor ours as a court, to question the correctness or even the plausibility" of an employee's premises for their religious conflict with an employer's policy);

*Redmond v. GAF Corp.* 574 F.2d 897, 900 (7th Cir. 1978) (the court determining the tenets of a particular religion is beyond the province of the court); *Keene v. City of San Francisco,* 2023 WL 3451687, at *6 (holding that "the sincerity of an employee's stated religious belief is… generally presumed or easily established"); *Davis v. Fort Bend Cty.,* 765 F.3d 480, 486 (5th Cir. 2014) (holding that examining religious beliefs at more than a surface level "would stray into the realm of religious inquiry, an area into which we are forbidden to tread"); *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados,* 279 F.3d 49, 56 (1st Cir. 2002) (Title VII "thus leaves little room for a party to challenge the religious nature of an employee's professed beliefs"); *U.S. v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995), *aff'd,* 95 F.3d 1475 (10th Cir. 1996) ("[I]f there is any doubt about whether a particular set of beliefs constitutes a religion, the Court will err on the side of freedom and find that the beliefs are a religion*"); Adeyeye v. Heartland Sweeteners, LLC,* 721 F.3d 444, 453 (7th Cir. 2013) (observing that courts are ill-suited to assess religious sincerity, and therefore the law must "tread lightly" when assessing whether an employee has a bona fide religious conflict with a policy).

Although the District Court does not take issue with the sincerity of Finn and Muldoon, it rejected the words they used to express their religious opposition to the vaccines and held that they were not motivated by religious beliefs but by "personal health, convenience, preference, or whim."  JA 51.  The District Court did not attempt to explain how Appellants' references to Jesus Christ, conscience, Pope Paul

VI's writings, ecclesiastical authority, the law of God, Christian upbringing, abortion, and spirituality, do not have a religious foundation. JA37-41. *Seeger* and *Welsh* define religion as a relationship with the Supreme Being which provides the basis for an individual's conceptualization of "moral, ethical or religious beliefs about what is right or wrong." *Welsh* tells us that "[w]hat is necessary under *Seeger* for a [belief] to be religious…is that this [belief] stem from the [believer's] moral, ethical or religious beliefs about what is right or wrong…" *Id.* at 390. As long as, in their own scheme of things, their objections to the vaccines arose out of their religiously based moral compass the District Court is not free to rewrite or recharacterize their accommodation requests.

Title VII of the Civil Rights Act of 1964 was amended by the Equal Employment Opportunity Enforcement Act in 1972, with the understanding that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief…" 42 U.S.C. § 2000e(j). The sponsor of this provision, Senator Jennings Randolph, stated when presenting this amendment that "the term 'religion' as used in the Civil Rights Act of 1964 encompasses, as I understand it, the same concepts as are included in the first amendment—not merely belief, but also conduct; the freedom to believe, and also the freedom to act." 118 Cong. Rec.-Senate 705 (1972). This legislative history demonstrates that the definition of the term "religion" as used in Title VII is the same as when it is used in the First Amendment, U.S. Const. Amend.1, and is capaciously defined. *Holt v. Hobbs,* 574 U.S. 352, 358

(2015) (Congress defined "religious exercise" capaciously to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief.")

Political, sociological, and philosophical views can be either religious or secular depending on whether they rest on moral principles based on God or rest solely on worldly or material realities. The concepts of religion and of politics, sociology and philosophy are not mutually exclusive categories. They overlap to the extent that political, sociological, and philosophical views are aspects of moral action founded on a consciousness of right and wrong somehow conveyed by God. *Seeger* and *Welsh* held that what is necessary for a belief to be religious is that it "stem from 'moral, ethical and religious beliefs about what is right or wrong.'" *Welsh,* 398 U.S. at 340. A determination that beliefs are "political, sociological or philosophical" or "even founded to a substantial extent upon considerations of public policy" does not resolve the issue of whether they are religious under Supreme Court precedent. A belief is secular and not religious only if it does "not rest at all upon moral, ethical or religious principle," *Welsh,* 398 U.S. at 342, or it involves a "moral code…which is in <u>no way</u> related to the Supreme Being." *Seeger,* at 186. "[O]verlap between a religious and political view does not place it outside the scope of Title VII's religion protections…." E.E.O.C.'s Guidance on Religious Discrimination, § 12: Religious Discrimination, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination. The fact that Finn and Muldoon may have viewed the

20

vaccinations as imperfect medical treatments does not undermine the religious nature of their opposition to vaccinations.

Finn and Muldoon's decision-making was religious under the ordinary meaning of the term at the time the First Amendment was adopted if it was in any way founded on "reverence of God [the Supreme Being]." Samuel Johnson, Dictionary of the English Language (4th ed. 1773).[4] Their decision-making is religious under *Welsh* unless it "rests <u>solely</u> upon considerations of policy, pragmatism, or expediency." *Welsh*, 398 U.S. at 342-43 (emphasis added). Under *Seeger* it is religious unless it was "a moral code which is not only personal, but which is no way related to a Supreme Being." *Seeger*, 380 U.S. at 186. The issue of whether a belief is religious or nonreligious (secular) depends on the source from which the belief is derived. If it is derived from God (the Supreme Being), it is religious. *Seeger* held that determining the source from which an individual derived his belief was not practically possible. Under *Seeger*, then, even though it is a factual issue it cannot be assessed by a court or jury beyond determining an individual's sincerity, which is not at issue in this case. The *Welsh* court noted that Welsh had asserted a strongly held moral belief, that his sincerity was not questioned, and that

---

[4] The Fourth Circuit utilizes this dictionary to discern the meaning words had at the time of the constitution. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1057 (4th Cir. 2023), *reh'g en banc granted,* No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024)

he did not have to derive his beliefs "from traditional religious convictions." *Id.* 398 U.S. at 340, 343.

Recent District Court decisions related to COVID-19 religious discrimination cases are helpful. In *Rolovich v. Washington State Univ.*, 2023 WL 3733894, at *10 (E.D. Wash. May 30, 2023), *judgment entered*, 2023 WL 5120279 (E.D. Wash. 2023) the District Court denied a motion to dismiss the plaintiff's Title VII discrimination claim after he was refused a religious exemption and fired for violating his employer's vaccine mandate. As in the instant case, the defendant employer alleged that the plaintiff had failed to adequately plead a religious-based objection to the vaccine. *Id.* at *3. However, the district court agreed with the plaintiff that the defendant was questioning the sincerity of the plaintiff's religious belief, and this challenge was inappropriate for a motion to dismiss. *Id.* at *3-4. Notably, the plaintiff refused to provide more of an explanation beyond that his Catholic beliefs prevented him from complying with the mandate, and the court found this was still sufficient to survive the motion. *Id.* at *3. Specifically, the court said:

> Plaintiff's claim that his Catholic faith informed his decision not to receive the COVID-19 vaccine is sufficient at the pleading stage to meet the prima facie element that he has a bona fide religious belief. Further, because [the mandate] imposed vaccination as a condition of employment for certain state employees, a religious-based objection to vaccination is sufficient to allege a conflict with employment duties. Taken together, Plaintiff has adequately pleaded the first element of the prima facie case for a failure to accommodate claim.

*Id.* Thus, the plaintiff was not required to explicate or justify his religious beliefs in order to survive a motion to dismiss his Title VII claim.

In *Gardner-Alfred v. Fed. Reserve Bank of New York,* 651 F. Supp. 3d 695, 721 (S.D.N.Y. 2023), the following was considered a sufficient allegation for justifying a religious opposition to the vaccine mandate: "[Plaintiff] is a member of the Temple of Healing Spirit, which believes in 'holistic approaches to health focused on diet and spiritual self-awareness, and opposes the invasive techniques of traditional medicine' and that she also believes in the dictates of the 'Book of Leviticus.'" Based on that allegation the Court refused to dismiss the claim of religious discrimination. *Id.* Finn and Muldoon signed even stronger verifications regarding their religious beliefs and there is no basis in the record for doubting their sincerity. *See also Leigh v. Artis-Naples, Inc.*, 2022 WL 18027780 (M.D. Fla. 2022) (wherein the court refused to dismiss a claim for religious discrimination under similar circumstances).

In *Camp v. L.A. Arena Co., LLC,* 2023 WL 4680797 (C.D. Cal. 2023) the District Court found that statistical evidence that an employer often denied religious accommodations could be used to prove a prima facie case. There, the plaintiff argued that statistics supported a claim of disparate treatment because the employer denied all but six out of 45 requests for religious accommodation. The Court denied the employer's motion to dismiss, finding that with the statistics cited, the plaintiff had sufficiently stated claims upon which relief could be granted.

23

The District Court relies on *Ellison v. Inova Health Care Services*, 2023 WL 6038016 at *5 (E.D. Va. 2023) in which the Court did not accept the plaintiffs' "Body as a Temple of the Holy Spirit" claims. This case lacks precedential value and was decided before the E.E.O.C. made its views known by filing an Amicus Brief in the Eighth Circuit. JA03, (Ex. 1 to Response to Motion to Dismiss, and a lawsuit, *E.E.O.C. v. United Healthcare Services, Inc.,* No. 2:23CV3010). More importantly, it is contradicted by the Eighth Circuit's decision in *Ringhofer.*

In short, the District Court erred when it held that Finn and Muldoon had not stated a claim for religious discrimination because they had not adequately tied their opposition to the vaccines to their religion.

## 2.    Conscience is an inherent aspect of religion.

The Supreme Court has not specifically defined "religion" for purposes of Title VII.[5] But it has accorded that term wide latitude and self-determination. One attribute of religion is that it seeks to answer questions of morality. What is right and what is wrong? Why does it matter if I choose to do evil? Why is there evil in the world? What happens after death? Is there really something called eternity, heaven, and hell? The religious tool humans use to make moral choices is referred to as "conscience." Certainly "conscience" can exist apart from religion but when a

---

[5] Title VII contains a definition of religion but it uses the same word in the definition and addresses the breadth of "religion" but not the nature of religion. "The term "religion" includes all aspects of religious observance and practice, as well as belief,…" 42 U.S.C. § 2000e(j).

religious person forms, and later exercises, his or her conscience, that is a religious act. It is often entwined with scripture, religious teachings, philosophy, and other metaphysical study. The substantive element of the definition of religion reflected in *Seeger* and *Welsh* is that some form of relationship with the Supreme Being is the foundation for the concepts of "what is right and should be done, of what is wrong and therefore should be shunned." *Welsh, 398 U.S.* at 340.

The District Court relied on *Foshee v. AstraZeneca Pharms. LP*, 2023 WL 6845425, at *5 (D. Md. 2023). In that case, Judge Russell's colleague states: "The same conscience-based justification could be used to evade any job requirement that Foshee disagreed with." *Id.* at *4. The *Foshee* Court explains the concern that by relying on "conscience" the plaintiffs were requesting a "blanket privilege that undermines our system of ordered liberty." In footnote 3 the Court explains this statement further:

> For example, a hypothetical plaintiff could assert, despite his shift starting at 8, that his God-given conscience or the Holy Spirit told him to rest and not start work until 10:30. Mandating that such assertions be accommodated as religious in nature would entirely frustrate an employer's ability to maintain an orderly workplace.

This footnote and the legal reasoning on which it is based runs directly contrary to the rule that requires an employer to provide reasonable accommodation for people observing the sabbath. *Groff v. DeJoy*, 600 U.S. 447 (2023). *See also Abercrombie*, 575 U.S. 768 at 773 (the Supreme Court's analysis regarding accommodation of the Jewish Sabbath). It is impossible to distinguish between a Jew leaving work at 3:30

25

p.m. on a Friday and the hypothetical facts given in footnote 3. The proper response by an employer to the employee who wants to roll into work at 10:30 is to examine whether there is a lack of sincerity (such as, the real reason is because he was intoxicated the night before) or to show that no reasonable accommodation can be provided (such as, she works on an assembly line that requires all employees to be present before anyone can start work). The response should not be to reject the requested accommodation merely because the employer does not understand it or has hypothetical concerns about chaos in the workplace. The hypothetical concern that a business might lose an "orderly workplace," suggested by the Court, simply need not occur.

The District Court in *Foshee* is also simply incorrect in its interpretation of conscience. The judge in *Foshee* stated:

> [P]laintiffs do not want to take the vaccines, therefore their consciences tell them not to do it, and they believe it is God's will or in accord with the Holy Spirit that they follow their consciences. That reasoning is not subject to any principled limitation in its scope. Their beliefs thus confer the type of unverifiable "blanket privilege" that courts cannot permit to be couched as religious in nature.

*Foshee*, 2023 WL 6845425, at *5. It is not clear why the *Foshee* Court thinks it has the right to doubt the validity of someone's conscience. The *Foshee* court failed to abide by the Supreme Court's view of religion being defined by a person's "own scheme of things." There is no "unverifiable blanket privilege" that the reasonable accommodation prong of Title VII cannot handle. This hypothetical concern lacks

26

merit and was answered by the Supreme Court in its cases about conscientious objectors. *Seeger*, 380 U.S. 163 (1965) and *Welsh*, 398 U.S. 333 (1970).

Religious practices are varied. Amish employees should not be forced to wear a uniform that displays buttons. Observant Jews should not be forced to work on Friday night. Vegetarian Hindus should not be forced to cook meat. But an Amish cook can be required to wear a clean uniform without buttons and a Jew can be required to work on non-Sabbath days. Ruth's Chris Steakhouse, on the other hand, may not be able to accommodate a vegetarian Hindu chef who refuses to cook meat. In short, the issue is accommodation, not religiosity. The employer is not free to say that buttons have nothing to do with religion, the sabbath is really Sunday, not Friday, or that cows are not sacred. The Supreme Court recently taught that the Free Exercise Clause protects the right of religious believers "of all kinds to live out their faiths in daily life through the performance of (<u>or abstention from</u>) physical acts." *Kennedy v. Bremerton School District,* 597 U.S. 507, 524 (2022) (emphasis added).

Here, Finn and Muldoon submitted a religious exemption form which, due to its very nature, informed HSUS of their religious opposition to the vaccines and put the employer on notice of the religious accommodation request. The form itself begins with "Religious Reasonable Accommodation Request Form." The form does not require the employee to use any particular words or to explain the theological basis for their reasoning. Finn and Muldoon were not obligated to justify their

27

beliefs or express them in a way that HSUS might understand or accept. There is no statutory authority or case law that would justify the employer demanding that the employee explain the nature of the employee's religious belief or why the vaccines run contrary to their moral code.

The exercise of one's conscience is patently a religious act. In the process of exercising one's conscience, a religious person is trying to distinguish between right and wrong, and good and evil. The conscience of a religious person brings into consideration that person's theology and religious teachings. For example, murder is considered evil because it violates the Fifth Commandment handed by Yahweh to Moses on Mount Sinai. The fact that modern legislation adopts the same prohibition does not render a religious person's opposition to murder non-religious. Does the fact that adultery is no longer a criminal act, but still a violation of the Sixth Commandment, mean that opposition to adultery is religious but opposition to murder is not?

Some Courts have applied a definition of "religion" from the Third Circuit's decision in *Africa v. Pennsylvania,* 662 F.2d 1025 (3rd Cir. 1981).[6] However, the Fourth Circuit has never adopted this line of authority and *Africa's* substitute criteria have no understandable reference point and are not a valid reflection of Supreme

---

[6] The U.S. District Court for the District of Maryland has already rejected this authority in the context of a COVID-19 employment discrimination case: *Shigley v. Tydings & Rosenberg LLP*, 2024 WL 1156613, at *3 (D. Md. 2024).

Court precedent. Moreover, *Africa* was decided in a wholly different context relating to dietary policies in a prison – it had nothing to do with forced medical care. Therefore, it has no application or relevance to the instant case. Moreover, a necessary element of the definition of religion is the idea of right or wrong, or morality, not a vague all-inclusive concept of "fundamental and ultimate questions having to do with deep and imponderable matters" that are considered in the *Africa v. Pennsylvania*, 662 F.2d at 1032 analysis.

The District Court's reasoning is fundamentally flawed based on long-standing authority and was rejected by the E.E.O.C., as explained in its Eighth Circuit Brief, JA03, (Ex. 1 to Response to Motion to Dismiss, and a lawsuit, *E.E.O.C. v. United Healthcare Services, Inc.,* No. 2:23CV3010. The District Court's decision must be reversed, and the case remanded for further proceedings. In short, when a religious person exercises her conscience, she is engaged in a religious act.

### 3. Appellant's objection to the use of aborted fetal tissue cell lines in the development of the vaccines implicates religious opposition.

In ruling against Muldoon, the District Court parsed her opposition to the vaccine by explaining that there is a difference between being opposed to abortion, which can be based on religious views, and being opposed to the use of aborted fetal tissue cell lines in the development and production of the vaccines. The District Court relied on *Kiel v. Mayo Clinic Health Sys. Se Minn.,* 2023 WL 5000255, at *7-9 (D. Minn. 2023) to conclude that this latter concern about aborted fetal tissue cell

lines "is not sufficiently tied to any religious belief." JA14, JA42, JA44, JA53. But that decision was reversed as part of the *Ringhofer* decision. Moreover, the District Court does not explain its logic but simply holds that one can be opposed to abortion because of religion but being opposed to the pharmaceutical use of the fruits of abortion is not religious. JA53. This distinction is illogical and does not support the District Court's holding.

The District Court acknowledged that the beliefs of Finn and Muldoon were sincerely held. However, the lower court disagreed with their assertion that their beliefs were "religious." The District Court incorrectly found as a fact that their beliefs were based on "secular morality or personal health, convenience, preference or whim." JA51. Despite Finn and Muldoon's explicit statements to the contrary, the District Court re-characterized Finn and Muldoon's words as some sort of non-religious opposition to the vaccine. The District Court did not explain how it could ignore the lengthy exemption requests that referenced Finn's and Muldoon's religious views. Muldoon referred to her conscience and faith in Jesus Christ. Finn referred to similar issues and also focused on the fact that the vaccines were developed using aborted fetal tissue cell lines. Few social issues in America have led to more religious debates than abortion. After all, on one side of the debate, the issue is the freedom of a woman to choose what to do with her body and, on the other side, is the view that abortion equates with murder. Even the dissent in *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022) acknowledges that the

abortion issue involves religion. "Some half-century ago, *Roe* struck down a state law making it a crime to perform an abortion unless its purpose was to save a woman's life. The *Roe* Court knew it was treading on difficult and disputed ground. It understood that different people's "experiences," "values," and "<u>religious training</u>" and beliefs led to "opposing views" about abortion." *Dobbs,* 597 U.S. at 365 (emphasis added) *quoting Roe v. Wade*, 410 U.S 113, 116 (1973).

In *Smith v. Terminix Pest Control, Inc.*, 2023 WL 3569127 (E.D. La. May 19, 2023), the court upheld a claim of religious discrimination based on the aborted fetal tissue cell line issue. The court explained:

> Plaintiff alleges he told Defendant that it would violate Plaintiff's sincerely held religious beliefs to take a vaccine derived from aborted fetal cell lines. As a consequence for his refusal to receive the vaccine, he was fired. The Court finds that, taking these allegations as true, Plaintiff has established a prima facie case of religious discrimination. As such, Plaintiff's claim for religious discrimination survives Defendant's Motion to Dismiss.

*Id.* at *4. An employee is not required to cite chapter and verse for the religious accommodation request and the employer is barred from making such demands. Muldoon's concern about cooperation with abortion by using a vaccine developed using aborted fetal tissue is religiously based and the District Court erred in holding otherwise.

31

### 4. An employer violates Title VII if it inquires into the religiosity of an accommodation request without an objective basis for doing so.

This case also involves the question of whether an employer can even begin a dialog with an employee who is requesting a religious exemption absent a preexisting "objective basis" for doubting the employee. The Supreme Court held that it is only necessary that plaintiffs find their beliefs to be religious "in [their] own scheme of things." *Seeger*, 380 U.S. at 185. The Supreme Court places this determination in the subjective mind of the plaintiff. The E.E.O.C. requires that there be an "objective basis" for questioning the religious nature or sincerity of a religious belief. The E.E.O.C. Compliance Manual explains: "If ... an employee requests religious accommodation, and an employer has an <u>objective basis</u> for questioning either the <u>religious nature or the sincerity</u> of a particular belief, observance, or practice, the employer would be justified in seeking additional supporting information" (emphasis added). E.E.O.C., Compliance Manual, § 12-I-A-3 (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.

HSUS had no objective basis for doubting the sincerity or religiosity of Finn and Muldoon and committed an independent violation of Title VII by making inquiries into their sincerity and the religiosity of their opposition to the vaccines. The District Court erred by holding that it and the employer may delve into the

32

religiosity of the employee's accommodation request in the absence of an "objective basis" for doubting it.

**B.   THE DISTRICT COURT ERRED BY DISMISSING COUNT 2 (ADA) BECAUSE THE MEDICAL INQUIRIES APPELLEE MADE WERE NOT JOB RELATED AND CONSISTENT WITH BUSINESS NECESSITY AND WERE MORE INTRUSIVE THAN NECESSARY.**

Count 2 of the Complaint alleges that HSUS violated the ADA by making inquiries into the medical records and status of Finn and Muldoon.  JA20, JA21.  This Count rests on the contention that employers may not make medical inquiries unless the inquiries are job related and consistent with business necessity.  Moreover, any inquiries an employer does make must be narrowly tailored and be no more intrusive than necessary.

The ADA states that an employer "may not discriminate on the basis of disability" and "the prohibition against discrimination … shall include medical examinations and inquiries."  42 U.S.C. §§ 12112(a) and (d)(1).  An employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability… unless such … inquiry is shown to be job-related and consistent with business necessity."  *Id.* § 12112(d)(4)(A).  To comply, the employer must show "(i) that the asserted 'business necessity' is vital to the business, (ii) that the examination genuinely serves the business necessity, and (iii) that the request is no broader or more intrusive than necessary."  *Id*. § 12112(b); *Blake v. Baltimore Cty.,* 662 F.

33

Supp. 2d 417, 422 (D. Md. 2009) (emphasis added); *see also Conroy v. N.Y. State Dep't of Corr. Servs.,* 333 F.3d 88, 97–98 (2nd Cir. 2003); *Lewis v. Gov't of District of Columbia,* 282 F. Supp. 3d 169, 188 (D.D.C. 2017) (discussing the demanding standards that "[o]ther circuits" employ to evaluate the assertion of a business necessity); *Psak v. Bernhardt,* 2020 WL 2849985, at *23 (D.D.C. 2020); *Coursey v. Univ. of Maryland E. Shore,* 2013 WL 1833019, at *5 (D. Md. Apr. 30, 2013), *aff'd,* 577 Fed. Appx. 167 (4th Cir. 2014). *Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.,* 172 F.3d 1176, 1183 (9th Cir.1999) (holding § 12112(d)(4)(A) "places the burden on the covered entity ... to make the requisite showing" that the examination is job-related and consistent with business necessity, which is a factual determination); *Davenport v. Michelin N. Am., Inc.,* 2012 WL 5381193, at *3 (D.S.C. 2012), *report and recommendation adopted*, 2012 WL 6212517 (D.S.C. Dec. 13, 2012); *Porter v. U.S. Alumoweld Co., Inc.,* 125 F.3d 243, 246 (4th Cir. 1997); *Allen v. Baltimore Cnty., Md.*, 91 F. Supp. 3d 722, 737–38 (D. Md. 2015) (employer-ordered medical examinations must be restricted to discerning if an employee can perform his or her job); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (request for a medical examination or inquiry must be "no broader or more intrusive than necessary"); *Conroy*, 333 F.3d at 98 (same); *Flanary v. Baltimore Cnty., Md.*, 2017 WL 1953870, at *7 (D. Md. 2017).

The ADA contains both a prohibition and a permission related to medical inquiries.  It prohibits medical inquiries that are not job related and consistent with business necessity but permits two types of inquiries:

> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site.  A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. § 12112(d)(4)(B).  Using the rule of statutory construction, *expressio unius est exclusio alterius*, Congress intended that other forms of inquiries are prohibited. The regulations promulgated under the ADA support this interpretation. 29 C.F.R. § 1630.14(c) governs medical inquiries of current employees and prohibits them unless they are job-related and consistent with business necessity: "A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity."  The only other inquiries related to current employees that are permitted by the ADA's regulations are voluntary or arise out of objective concern related to an employee's fitness for duty.  Obviously, such examinations and inquiries would involve an analysis of the employee's duties and job description.

In *Purvenas-Hayes v. Saltz, Mongeluzzi & Bedensky, P.C.,* the District Court for the Eastern District of Pennsylvania explained that under the ADA the courts must give the term "inquiry" an expansive definition:

The ADA doesn't define the term "inquiry," so I give the term its ordinary meaning. In 1990, when Congress passed the ADA, "inquire" meant "to seek information; ask a question or questions." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 697 (3d ed. 1988) (defining "inquiry" as "the act of inquiring"). So, when Section 12112(d)(4)(A) bars an employer from "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability," it is prohibiting the employer from asking questions as to whether the employee is an individual with a disability. And when Section 12112(d)(4)(B) permits an employer to make "inquiries into the ability of an employee to perform job-related functions," it is permitting the employer to ask questions about the employee's ability to perform those functions.

…

SMB's argument fails because it takes too narrow a view of the word "inquiry." According to SMB, an "inquiry" in Section 12112(d)(4)(B) is "one into 'whether such employee is an individual with a disability or as to the nature or severity of the disability.'" But SMB's argument ignores the language of subparagraph (A). In that paragraph, Congress explained the type of inquiries that an employer could not make—those "as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A). Congress's inclusion of that limiting language indicates that Congress understood that the word "inquiries," standing alone, was not limited to inquiries about disabilities; that's why Congress had to add language to limit the scope of the covered inquiries. But Congress did not include the same limiting language in subparagraph (B). Instead, it permitted inquiries into "the ability of an employee to perform job-related functions." Id. § 12112(d)(4)(B). Unlike in subparagraph (A), Congress did not limit the inquiries in subparagraph (B) to those made "of an employee," nor did it limit it to examinations about the existence of [sic] severity of a disability. Compare id. § 12112(d)(4)(A) with § 12112(d)(4)(B). The "use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *United States ex rel. Petratos v. Genentech Inc.,* 855 F.3d 481, 488 (3d Cir. 2017). Congress's use of different language in subparagraphs (A) and (B) to limit the scope of the relevant inquiries indicates that it intended the limits to be different.

*Purvenas-Hayes v. Saltz, Mongeluzzi & Bedensky, P.C.,* No. 2:23-CV-02403-JDW, 2023 WL 8702739, at *2 (E.D. Pa. Dec. 15, 2023) (some citations omitted).

The ADA's prohibition regarding medical inquiries is directly linked to whether the employee may perform job related functions. Thus, for example, an employer is not permitted to ask employees or job applicants whether they are on birth control, whether they are pregnant, whether they have undergone heart surgery, whether they are on anti-viral medications, etc.—unless the employer can show that the inquiry is related to a job-related function. Even though these types of inquiries do not necessarily expose a disability, they are not job-related and consistent with business necessity and are, thus, prohibited.

The District Court in the instant case did not follow the analysis from *Purvenas-Hayes v. Saltz, Mongeluzzi & Bedensky*. Rather, it rejected Finn and Muldoon's ADA arguments by incorrectly holding that "It is well settled that an inquiry about vaccination status does not constitute a medical examination or an inquiry about a disability or disabling condition." JA56. The District Court relied on *Foshee,* 2023 WL 6845425 at *6 in which the District Court held that inquiries about vaccination status are not prohibited because "both vaccinated and unvaccinated people are able to perform their work … without impairment…" *Id.* The District Court in this case went on to cite *Jorgensen v. Conduent Transp. Solutions, Inc.*, for the proposition that inquiries about vaccination status are

permitted because they do not "constitute a medical examination or inquiry about a disability or disabling condition."  JA56.

The District Court missed the mark by reading these non-binding precedents too broadly.  Judge Russell, and the other judges of the Maryland District Court upon which he relied, failed to relate the vaccination inquiry to a job requirement.  They focused, instead, on whether the inquiry related to a disability.  This focus was incorrect in two respects.  First, it ignores the breadth of the ADA's prohibition regarding medical inquiries.  Medical inquiries must relate to an employee's ability to perform his or her job.  Second, assuming arguendo that medical inquiries about non-disabling conditions are permitted, the Court erred by ruling as a matter of law, that an inquiry about vaccination will not lead to information about a disability.

The District Court relied on a "Notice" published by the E.E.O.C. on the internet about how employers should comply with the ADA in the context of COVID-19.  That notice does not have the force of law, or even of regulations.[7]  The District Court opinion states:

> The EEOC has confirmed that inquiries about COVID-19 vaccination status do not constitute a medical examination or inquiry about a disability or disabling condition:
>> When an employer asks employees whether they obtained a COVID-19 vaccination, the employer is not asking the employee a question that is likely to disclose the existence of a disability;

---

[7] *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 141 (1976) (stating that E.E.O.C. guidelines are entitled to less weight than regulations that have the force of law and are less persuasive when they are in opposition with other statutory interpretation factors, such as the legislative history of a given statute).

> there are many reasons an employee may not show
> documentation or other confirmation of vaccination besides
> having a disability. Therefore, requesting documentation or
> other confirmation of vaccination is not a disability-related
> inquiry under the ADA, <u>and the ADA's rules about making such
> inquiries do not apply.</u>
>
> EEOC, What You Should Know About COVID-19 and the ADA, the
> Rehabilitation Act, and Other EEO Laws, at K.9,
> https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-
> and-ada-rehabilitation-act-and-other-eeo-laws#K.    As Finn and
> Muldoon cannot plausibly allege that the Humane Society violated the
> ADA by inquiring about their vaccination status, Count II of the
> Complaint will be dismissed with prejudice.

JA17-18 (emphasis added). Surprisingly, this webpage guidance published by the

E.E.O.C. undermines the regulations promulgated to enforce the ADA by stating that

the "ADA's rules about making such inquiries do not apply." The E.E.O.C. is bound

by the text of the ADA and by the regulations promulgated under the ADA. It may

not, by webpage fiat, declare that the ADA regulations do not apply. The E.E.O.C.'s

webpage guidance is incorrect. It states: "the employer is not asking the employee

a question that is likely to disclose the existence of a disability." But in light of the

vaccine contraindications, this simply is not true. Any employee with a

contraindication to the vaccines would reveal that medical condition by disclosing

his or her vaccination status. For example, the CDC specifically states that people

who have experienced myocarditis or pericarditis in reaction to a prior vaccination

should not be vaccinated. People with SARS-CoV-2 infection should not be

vaccinated. Individuals with MIS-A (Multi-System Inflammatory Syndrome in

Adults) have a dysregulated immune response to SARS-CoV-2 and may not be good

candidates for vaccination.  Patients with a previous severe allergic reaction, such as anaphylaxis, to a previous dose or component of an mRNA COVID-19 vaccine or flu vaccine should not be vaccinated.  All of these contraindications could expose an employee's disability to an employer.

For a medical inquiry to be permitted under the ADA it must be supported by "business necessity."  In *Conroy*, the Second Circuit explained how the "business necessity" defense under 42 U.S.C. § 12112(d)(4)(A) may be satisfied.  *See Conroy*, 333 F.3d at 97 (interpreting 42 U.S.C. § 12112(d)).  To demonstrate a "business necessity," an employer "must first show that the asserted 'business necessity' is vital to the business."  *Id.* at 97 (stating that an employer cannot merely demonstrate that an examination or inquiry is "convenient or beneficial" to its business).  An employer "must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary."  *Id.* at 98.  The employer "need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal."  *Id.* Moreover, an employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the general [examination or inquiry] requirement contributes to the achievement of those business necessities."  *Id.* at 101.

40

Finn and Muldoon were not working in a medical facility. The Supreme Court specifically held that COVID-19 is not a job-related condition. *Nat'l Fed'n of Indep. Bus.*, 595 U.S. 109, 119 (2022) (COVID-19 is an "every day risk that all face" not an "occupation-specific risk"). The District Court does not address the difference between, for example, an office employee working remotely (Finn and Muldoon) and a nurse in a neonatal intensive care unit. Yet, the Supreme Court held that such distinctions must be made. *Id.* (rejecting the mandates under the authority provided in the Occupational Health and Safety law) and *Biden v. Missouri*, 595 U.S. 87 (2022) (upholding the mandates under the authority provided under the Medicare law).

The District Court relies on *Jorgenson v. Conduent Transp. Sols., Inc.*, 2023 WL 1472022 (D. Md. 2023) (affirmed *per curium* in an unreported decision, 2023 WL 410570).[8] The facts in *Jorgensen* are wholly distinguishable. The employee in *Jorgenson* could continue working unvaccinated if he agreed to wear a mask and otherwise mitigated against the disease. *Id.* at *1. Plaintiff Jorgenson refused to upload his vaccination status and never asked for accommodation from Defendant's policies. *Id.* Plaintiff Jorgenson would not comply with disease-mitigating measures, but Finn and Muldoon would have. Here, Finn and Muldoon were

---

[8] *Jorgenson* involved a *pro se* appellant whose brief failed to adequately address the district court's ruling and the affirmance should be given no weight.

terminated for their unvaccinated status after their religious exemptions were denied. *Jorgenson* has no precedential value in this case.

Neither the District Court nor HSUS addressed how a vaccine mandate can be job-related and consistent with business necessity, and not subject to reasonable accommodation, when the employees are working from home. It does not examine how closely Finn and Muldoon worked with others, whether other mitigation measures could be employed, and what sort of risk, if any, they actually posed to their co-workers. HSUS could not provide that sort of explanation because it never examined the facts and circumstances that surround the jobs held by Finn and Muldoon. The District Court did no better.

Implicit in the District Court's decision is the assumption that private employers may impose any medical and physical standards, regardless of their relation to job requirements, as long as they are not likely to expose or implicate a disability. But, the ADA requires that medical information obtained through an employer inquiry be maintained in separate and confidential files and only be used in accordance with the statute. 42 U.S.C. § 12112(d)(3)(B-C). If an employer makes use of medical information it obtains from employees through its inquiries, it may only do so if the medical information is "job-related" and "consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). There appears to be no limit to what medical information, unrelated to a "disability," that HSUS believes it may require from employees. Clearly, however, HSUS would concede that it may not ask its

42

female employees to disclose their birth control methods, absent highly unusual circumstances. *See, e.g., Garlitz v. Alpena Reg'l Med. Ctr.*, 834 F. Supp. 2d 668, 679 (E.D. Mich. 2011) (stating that questions about an employee's pregnancy and childbirth status are *per se* unlawful under Title VII barring a direct link to occupational qualifications). Could an employer require all employees to disclose the purpose of all medical visits, all prescriptions they are taking, their past history of sexually transmitted diseases, past or contemplated plastic surgery, or any other medical procedure that does not implicate a disability or impairment? Generally, such inquiries would not be job-related and consistent with business necessity and would be considered prohibited inquiries. 29 C.F.R. § 1630.14(c). In short, there is no reason an employee's vaccination status is a permissible inquiry, especially when the employee is working from home.

> ### C. THE DISTRICT COURT ERRED WHEN IT HELD THAT APPELLANTS HAD NOT ALLEGED SUFFICIENT FACTS TO STATE A CLAIM THAT THEY WERE "REGARDED AS" DISABLED BY THEIR EMPLOYER.

The District Court ruled against Finn and Muldoon with regard to Count 3, the "regarded as" claim under the ADA. The District Court supported this holding only with other district court opinions. The District Court ignored the allegations of the complaint and recharacterized the complaint as involving mere "personal choices." This constituted reversible error.

When Finn and Muldoon were terminated, HSUS regarded them as disabled because of their unvaccinated medical status. JA26. This condition was neither transitory nor minor. At that time, unvaccinated individuals had limitations imposed that limited many of life's major activities. JA25. For example, unvaccinated individuals were: prohibited from going into many private and public buildings; barred from restaurants and bars; required to refrain from attending any sort of gathering of people; required to avoid going to parties; meetings; church services; prohibited from playing sports that required social distancing; required by many business establishments to prove that they were vaccinated before obtaining services from such establishments; and prohibited from flying on commercial airlines. JA25.

HSUS considered unvaccinated individuals such as Finn and Muldoon to be at a higher risk of transmitting COVID-19 and Finn and Muldoon were "regarded as" disabled by HSUS due to their status as unvaccinated. A person's vaccination status is a medical condition, not unlike a person taking any other sort of prescription for an ailment. JA21. A physician considers that information when treating a patient. There can be no doubt that vaccination is a medical procedure that alters a patient's physiology. It is recorded in a patient's medical chart and considered part of the patient's medical history when treating the patient for COVID-19 or any other medical condition. HSUS demanded, as a condition of employment, information about the medical treatment and status of Finn and Muldoon. It made this inquiry without any basis to believe that the information it sought was job-related and

44

consistent with business necessity.   JA20.   HSUS was making these inquiries

because it regarded their unvaccinated status as a medical condition that

substantially limited their ability to engage in all sorts of activities, including the

ability to interact with other employees.

Under the ADA, an individual meets the definition of "disabled" if she is

"regarded as" disabled, whether or not she has an impairment:  The statute states:

> An individual meets the requirement of "being regarded as having such
> an impairment" if the individual establishes that he or she has been
> subjected to an action prohibited under this chapter because of an actual
> or perceived physical or mental impairment whether or not the
> impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12101(3)(A).  *See E.E.O.C. v. STME, LLC*, 938 F.3d 1305, 1314 (11th

Cir. 2019); *Forsyth v. Univ. of Alabama, Bd. of Trustees*, 2021 WL 4075728, at *4

(11th Cir. 2021); *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1374

(N.D. Ga. 2012).  Thus, if the employee is perceived as disabled, and therefore meets

the statutory definition of "disabled," the employer is required to engage in the

reasonable accommodation analysis and process.

In this case, the District Court held that remaining unvaccinated is not an

impairment, but a personal choice and, therefore, there was no need to consider

reasonable accommodations.   JA57, JA58.   The Court relied on statements and

theories espoused by his colleagues in *Foshee* and *Shigley v. Tydings & Rosenberg,*

*LLP,* 2024 WL 1156613, at *6 (D.Md. 2024).  The Fourth Circuit has not addressed

the issue of "regarded as" claims involving COVID-19 vaccines.

45

The existence of choice is irrelevant to whether HSUS considered Finn and Muldoon to be disabled or a direct threat to others. Many disabilities involve choices. For example, lung cancer may be caused by the choice to smoke, and a lumbar discectomy may be elective surgery, but it may render an employee unable to perform lifting duties. Choice is not the issue and is irrelevant to determining if an employee is "regarded as" disabled.

The "regarded as" language of the ADA is intended to protect employees who may have a condition which does not rise to the level of a true disability as defined in the statute but which the employer views as a disability. Finn and Muldoon alleged that HSUS viewed their vaccination status as impairing their ability to work. That allegation must be accepted as true. The District Court is not permitted, when ruling on a motion to dismiss, to ignore those allegations and assume the employer had a non-discriminatory motive.

## VI.   CONCLUSION

The District Court must be reversed because Finn and Muldoon articulated religiously based opposition to the vaccines. At that point, HSUS should have proceeded to analyze whether Finn and Muldoon could be accommodated. The District Court erred when it parsed the words of the vaccine exemption requests and held that they do not sufficiently link to religion.

HSUS regarded its employees as disabled and violated the ADA by making medical inquiries and conducting medical examinations of its employees that were

neither job-related nor consistent with business necessity. Finn and Muldoon were working at home – they did not pose a direct threat to their co-workers. For these reasons, Finn and Muldoon respectfully request that the Court reverse the District Court's decision.

## VII.   STATEMENT REGARDING ORAL ARGUMENT

Finn and Muldoon hereby request the opportunity to present oral argument. The issues in this case have wide-ranging impact and have been subjected to few, if any, appellate court decisions. Neither the Fourth Circuit nor the Supreme Court has decided the extent to which an employee may refuse to comply with a COVID-19 vaccine mandate issued by a private employer. Similarly, neither the Fourth Circuit nor the Supreme Court has decided whether an employer may demand that employees reveal their vaccination status to their employer when they are remote workers who pose no threat to co-workers. This is a case of first impression.

Respectfully submitted,
**KSC LAW**

By:  _____/s/_____
     Francis J. Collins, Esq.
     CPF ID No. 8501010118
     Fed Ct. # 04272
     fjcollins@kscadvocates.com
     and
     Samantha M. Safchinsky, Esq.
     safchinsky@kscadvocates.com
     201 N. Charles Street, Tenth Floor
     Baltimore, Maryland 21201
     (410) 244-1010 (telephone)
     (410) 244-8001 (fax)

# Certificate of Compliance

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __24-1418__      Caption: __Finn et al. v. Humane Society of the United States__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ___12,196___ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Word _____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Francis J. Collins _____

Party Name Appellants _____

Dated: 6/21/2024 _____

04/12/2020 SCC

48